UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PATICIA JOHNSON,<br>    *Plaintiff,*<br>  *v.*<br>JOSE ESCOBAR, SR.,<br>    *Defendant.* | Civil No. 3:14cv533 (JBA)<br><br>August 11, 2016 |

**MEMORANDUM OF DECISION**

On April 21, 2014, Plaintiff Paticia Johnson filed suit against New Haven police officer Jose Escobar under 42 U.S.C. § 1983 seeking redress for injuries resulting from Defendant's use of force on her on June 4, 2011 on the sidewalk adjacent to 821 Chapel Street, New Haven, Connecticut, which she claimed was unreasonable in violation of the Fourth Amendment. After Plaintiff discharged her counsel, the case proceeded to trial over two days in which Plaintiff and Defendant were the only witnesses to testify. The following constitutes the findings of fact and conclusions of law pursuant to Fed. R. Civ. P 52(a)(1) based on their testimony and the exhibits admitted.

**I.    Findings of Fact**

Plaintiff's testimony is undisputed that prior to the parties' encounter which forms the basis of this lawsuit, Ms. Johnson was persuaded to join two friends for a "girls' night out" even though she feared it could put at risk her prior rehabilitation successes. After several drinks, the three women took a taxi to New Haven nightclub Club Karma where Plaintiff had another drink and the three left to go to Club Alchemy around the corner. At approximately 11:45 p.m., Ms. Johnson and her friends went to a nearby pizza restaurant, the Golden Rock. There, a loud, profanity-laced confrontation ensued with the cashier/owner, which Ms. Johnson attributes to her friend Ranita who was "over intoxicated at the time." Defendant Escobar, who was working the downtown bar

detail serving an extra duty shift at Club Karma, heard this disturbance from the street, entered the restaurant and observed Ms. Johnson loudly swearing and using profanity. After Defendant escorted Plaintiff and Ranita out of the restaurant, he returned to speak to the owner who said he did not want to make a formal charge even though Ms. Johnson had also slapped him in the face; he just wanted them out of his place.

Defendant Escobar, who had not previously seen Ms. Johnson and her friends at Karma, now saw them back in front of Karma where Plaintiff's continued swearing was causing a disturbance. While there is some dispute over who said what to whom in front of Karma, Plaintiff was informed she was not allowed to enter the club. Defendant attempted to speak to Plaintiff but she walked away from him, at which point he advised her to keep walking because she was not allowed back in the club. Plaintiff stopped, turned around, and addressed Defendant in terms and tone that the parties hotly dispute. She claims to have questioned whether he was talking to her; he testified that she was screaming profanities at him. Defendant then walked over to her to effect an arrest, telling her to put her hands behind her back. She did not comply. The parties' versions of what happened next differ dramatically. Defendant testified that Plaintiff swung her arms in an attempt to strike him; she denied such conduct. Defendant grabbed her arm to cuff her, a struggle ensued, he took her to the ground using a sweeping leg technique, yelling at her to stop resisting, and finally, he cuffed her from the front "just to stop the struggle." She testified that before she could ask Defendant why he was arresting her, and as she was calling 911, Defendant had handcuffs in his hand, and punched her in the face with his fist. Plaintiff added that when she fell backwards on her back, Defendant slammed her head into the gate and punched her repeatedly in her face, threw her around on her stomach, and dragged her on the concrete.

Once released from detention, Ms. Johnson promptly sought medical treatment at Yale-New Haven Hospital. The attending physician noted a two-inch facial abrasion and a contusion and recommended that she "take Motrin as directed," "rest the injured area until the pain and swelling are better," and "apply ice packs every hour for 2-3 days." (June 4, 2011 Yale-New Haven Hosp. Adult Emerg. Servs., Def.'s Ex. D [Doc. # 24-4] at 3, 5, 14, 14.) The hospital record also noted that Ms. Johnson was "uncooperative," "unwilling to answer questions," refusing to allow x-rays to be taken, "arguing/upset/yelling," and that "numerous attempts were made to convince [her] to allow interventions." (*Id.* at 5.) Ms. Johnson testified that all of the physicians and nurses who attended to her and made these assessments were being untruthful. The medical record reflected that Ms. Johnson was put in a "4 pt. lock" restraint for approximately two hours due to her "yelling and threatening" and being "verbally assaultive." (*Id.* at 1).

When Ms. Johnson left Yale-New Haven Hospital, she sought additional treatment at Saint Raphael Hospital in New Haven, Connecticut, registering there at 5:18 AM on June 4, 2011. There, she "complain[ed] of moderate pain" after claiming she had been "assaulted by a police officer who hit her and forced her down to the street." (St. Raphael Clinical R., Def.'s Ex. E [Doc. # 24-5] at 1.) Her attending physician and nurse noted that she was not in "acute distress" and was "alert," and described the injury on her forehead in terms of "mild tenderness, moderate swelling and superficial laceration," also noting a decreased range of motion in her neck. (*Id.* at 2–3.) When Ms. Johnson was discharged several hours later at 11:12 a.m., the registered nurse described her condition as "stable." (*Id.* at 4.) While Ms. Johnson testified that she returned home from Saint Raphael with her arm in a sling, the hospital records contain no reference to such treatment. (*See generally id.*)

Two days later, on June 6, 2011, Ms. Johnson sought additional medical treatment at Saint Vincent Hospital in Bridgeport, Connecticut. The hospital records from this visit note that the "severity of the symptoms [were] moderate" and that Ms. Johnson was "walking with a limp," "guarding her R[ight] arm" and had a "2 in laceration on her forehead that is healing." (St. Vincent Hosp./PreHosp. R., Pl.'s Ex. 3 [Doc. # 24-6] at 1.) The records further note that Ms. Johnson "ha[d] a deformity on her left forearm which is guarded, [that she] complains of right shoulder pain and has limited range of motion and right knee pain associated with abrasion on her knee cap," and that her "right arm had no grasp when asked to squeeze [the treating physician's] hands." (*Id.*) However, after taking x-rays of Ms. Johnson's wrist, the doctor concluded: "[d]eformity at the base of the fifth metacarpal mostly likely represents an old healed fracture rather than an acute fracture, but please correlate clinically in this area. There is no other evidence of fracture, dislocation or other significant bony abnormality." (*Id.*) Ms. Johnson was then prescribed Vicodin "as needed" and referred to an orthopaedic specialist to ascertain whether her injured wrist was an old or new injury, as well as a course of treatment for her. (*Id.* at 10, 16)

On June 8, 2011, Ms. Johnson sought follow-up treatment for her wrist at the Orthopedic Specialty Group, PC, in Fairfield, Connecticut, where she was seen by Dr. Jeffrey Herman who noted in her "History" that she claimed to have been "assaulted by a known acquaintance" and had "sustained injury not only to the right hand but also to the left shoulder, right knee and forehead," causing her to experience "extremely severe pain in the right hand . . . [that was] sharp, stabbing, throbbing, aching, and burning," causing her to awaken at night with pain. (Orthopedic Specialty Grp., Consultation, Def.'s Ex. I at 4.) Dr. Herman's observations, however, noted "[n]o apparent distress. Clinically stable vital signs. Alert and oriented[,]" and that "examination of the right hand

4

and wrist reveal[s] no evidence of swelling, ecchymosis or erythema. Skin is intact. No evidence of abrasions." (*Id.*)

During this visit, Dr. Herman took three radiographs of Plaintiff's wrist at different angles, which demonstrated "evidence of a base of fifth metacarpal fracture along with slightly impacted hamate fracture," leading him to conclude: "it appears that Patricia [sic] has sustained an injury to the right hand. Her examination is somewhat confusing given the fact that there is really very limited swelling or ecchymosis given her x-rays. In addition, the acuity is called into question by the official radiology," and while Ms. Johnson claims that she did not "fight[] back during the assault," her injury is "almost universally associated with punching." (*Id.* at 5.) When explaining to Ms. Johnson the radiology findings, including that they called into question the acuity she reported, Dr. Herman noted that she "became quite agitated," and the office staff described her behavior as "disruptive and antagonistic." (*Id.*) Under cross examination, Ms. Johnson testified that she was not agitated but was merely disagreeing with some of Dr. Herman's comments. She was placed in an "ulnar gutter cast" and returned on June 15, 2011 and July 13, 2011 for checkups. (*Id.*)

Although the hospital reports reflect the results of the physical altercation which Ms. Johnson and Officer Escobar were involved in on June 3, 2011, the reported medical findings do not reflect the type or degree of injuries which reasonably would be expected to be seen if Officer Escobar had punched Ms. Johnson repeatedly in the face and slammed her head into a gate as Plaintiff claims.

## II.      Conclusions of Law

To prevail on her claim under § 1983, Ms. Johnson must demonstrate that the challenged conduct (1) was committed by a person "acting under color of state law"; and (2) "deprived her of

rights, privileges or immunities secured by the Constitution or laws of the United States." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003) (internal quotation marks omitted). There is no dispute that Officer Escobar was acting under the color of state law when he arrested Ms. Johnson; the central question for resolution by this trial is whether Plaintiff has proved that he violated her Fourth Amendment rights.

It is well established that the Fourth Amendment protects individuals from unreasonable use of force when being arrested. *See Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). In assessing whether an officer's use of force was "excessive" or "unreasonable" under the Fourth Amendment, the "objective reasonableness test" requires balancing the plaintiff's Fourth Amendment rights against competing governmental interests while considering the circumstances "from the perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). This "balancing . . . 'requires careful attention to the facts and circumstances of each particular case, including'" (1) the severity of the underlying crime; (2) "'whether the suspect poses an immediate threat to the safety of the officers or others'"; and (3) "'whether [s]he is actively resisting arrest or attempting to evade arrest by flight,'" *Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015) (quoting *Graham*, 490 U.S. at 396), allowing "'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,'" *Parmley*, 465 F.3d at 61 (quoting *Graham*, 490 U.S. at 397). While "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, the amount of force an officer employs must be "reasonably related to the nature of the resistance and

6

the force used, threatened, or reasonably perceived to be threatened, against the officer," *Brown*, 998 F.3d at 109 (internal quotation marks omitted).

Here, although the circumstances of Plaintiff's alleged crimes of breach of peace and interfering with police (Jt. Ex. A) did not constitute severe crimes, and she was doing the opposite of attempting to flee, given what Defendant had observed or learned of Plaintiff's earlier unruly behavior that night, her unexpected change of course while he was addressing her, and her resistance to arrest, Officer Escobar's uncertainty about her intentions was reasonable, and he was justified in using some force, implicit in taking Plaintiff to the ground.[1]

Without doubt, if Defendant had slammed Plaintiff into the ground or repeatedly punched her in the face as she described, he would have grossly exceeded any objective standard of reasonableness. However, Plaintiff's account is not supported by the medical records in evidence, which are devoid of any description of injuries consistent with the ferocious facial punching and head slamming to which Plaintiff claims she was subjected. The laceration on Plaintiff's forehead, described by doctors as "superficial," required no suturing or special attention beyond cleaning, doctors noted no other facial contusions or cuts, and the CT scan revealed no evidence of traumatic injuries. Indeed, Plaintiff's account is further undermined by the reports of hospital staff that Plaintiff exhibited combative behavior ("verbally assaultive", "threatening" "arguing" upset" "yelling")—much like the behavior Defendant alleges Plaintiff was displaying when he arrested her—which necessitated placing her in four point restraints for almost two hours (2:40 am to 4:30

---

[1] Officer Escobar testified that he was trained to take suspects to the ground for officer safety if "you're standing toe to toe with someone, you have no idea what their intentions are, [or] if they have any weapons. So when you take them to the ground, you're in more of a controlled setting; you're more on top of the situation where you're able to have more control of that suspect."

am).[2]

Thus, although the evidence at trial clearly showed that Plaintiff was traumatized and greatly upset at her encounter with Defendant, and that she sustained contusions and abrasions, with associated tenderness and pain, without any other witness or evidence to support her account, the Court cannot conclude that her evidence predominates over Officer Escobar's version which showed an objectively reasonable use of force under the circumstances he described. Plaintiff has not, therefore, met her burden of proving her claim that Defendant's use of force was grossly excessive.

## III.    Conclusion

Based on the evidence presented at trial, the Court concludes that Ms. Johnson has not proved by a preponderance of the evidence that Officer Escobar's actions on June 3-4, 2011 rose to the level of a Fourth Amendment excessive force violation.

Accordingly, judgment will be entered in favor of Defendant. Plaintiff's Motion [Doc. # 49] to Enforce Judgment is DENIED as moot. The Clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 11th day of August, 2016.

---

[2] Plaintiff's emphatic denial of this conduct is not credible, as Plaintiff was unknown to the hospital staff, and none were shown to have had any motivation to dissemble.